UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 15-CV-6612 (JFB)

COSMOS JOSEPH SCIOSCIA,

Plaintiff,

VERSUS

CAROLYN W. COLVIN, ACTING COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION,

Defendant.

**MEMORANDUM AND ORDER**
March 9, 2017

JOSEPH F. BIANCO, District Judge:

Plaintiff Cosmos Joseph Scioscia ("plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA") challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying plaintiff's application for disability insurance benefits. An Administrative Law Judge ("ALJ") found that plaintiff had the residual functional capacity to perform the full range of light work, of which there were a significant number of jobs in the national economy, and, therefore, that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review.

The Commissioner now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff opposes the Commissioner's motion and cross-moves for judgment on the pleadings.

For the reasons set forth below, the Court denies the Commissioner's motion for judgment on the pleadings, denies plaintiff's motion for judgment on the pleadings, and remands the case to the ALJ for further proceedings consistent with this Memorandum and Order.

I. BACKGROUND

A. Facts

The following summary of the relevant facts is based on the Administrative Record ("AR") developed by the ALJ. (ECF No. 7.)

1. Personal and Work History

Plaintiff was born on January 6, 1964. (AR at 61.) He graduated from high school and has some college education. (*Id.* at 26.) His past relevant work includes positions as

director of special events for a country club, as a general/regional manager, and four months as a telemarketer. (*Id*. at 77.)

After raising a family and working for most of his adult life, plaintiff's medical problems began on June 19, 2010, when he suffered an on-the-job accident. (*Id*. at 216.) He struggled to work for the next two years, but his impairments forced him to stop working. (*Id*. at 27-31.) Plaintiff continued to look for employment while pursuing his claim for disability benefits. (*Id*. at 27.)

2. Medical History

   a. Prior to Onset Date of July 6, 2012

On July 16, 2010, plaintiff began treatment with Dr. Enrico Mango for a work-related injury that occurred on June 19, 2010. (*Id*. at 216.) X-rays of plaintiff's left knee revealed patellofemoral degenerative changes. (*Id*. at 217-18.) Dr. Mango's clinical impression of plaintiff's condition was acute knee left anterior strain and a traumatic chondromalacia patella of the left knee. (*Id*. at 217.) Dr. Mango requested approval of an MRI to rule out anterior cruciate ligament tear and a meniscal tear. (*Id*.) Dr. Mango opined that plaintiff was "total disabled." (*Id*.)

Plaintiff subsequently visited Dr. Mango for treatment on July 27, 2010 (*id*. at 219), August 3, 2010 (*id*. at 221), and August 17, 2010 (*id*. at 223). On August 18, 2010, Dr. Mango approved plaintiff's return to work on a part-time basis. (*Id*. at 224.) On September 7, 2010, an MRI of plaintiff's left knee revealed a grade 2 signal within the posterior horn of the medial meniscus and small joint effusion. (*Id*. at 304.) On April 7, 2011, plaintiff underwent left knee surgery for an ACL repair performed by Dr. Mango. (*Id*. at 310-14.) From March 19, 2012 through April 17, 2012, Dr. Mango administered a series of five Hyalgan injections to plaintiff's left knee. (*Id*. at 269-78.) On April 27, 2012, Dr. Mango advised plaintiff not to return to work because plaintiff reported that his left knee buckled and that he was unable to bear full weight. (*Id*. at 280.)

On May 4, 2012, an MRI of plaintiff's left knee revealed interval placement of an anterior cruciate ligament graft, with a frayed graft, which was irregular in signal consistent with a partial thickness tear. (*Id*. at 306.) The MRI also revealed an interval development of a horizontal tear of the posterior horn of the medial meniscus, degenerative changes of the knee medially, large joint effusion, and popliteal cyst. (*Id*.)

   b. After Onset Date of July 6, 2012

Upon examination on July 20, 2012, Dr. Mango deemed plaintiff's condition as "unchanged." (*Id*. at 214.) The examination findings indicated that plaintiff had decreased left knee antero-medial pain with a decreased activity level, along with weakness in the left knee with prolonged activity. (*Id*.) Dr. Mango opined that plaintiff had a "partial" disability, and recommended physical therapy three times a week for six weeks. (*Id*.) Dr. Mango's prognosis for plaintiff was "guarded." (*Id*.) Dr. Mango also recommended heat treatment. (*Id*.)

On August 17, 2012, Dr. Mango's assessment and prognosis of plaintiff's condition were the same as his July 20, 2012 assessment and prognosis of plaintiff's condition. (*Id*. at 213-14.) Plaintiff was noted as having bilateral knee pain with increased activity, and on-and-off right knee pain due to his favoring of his left knee. (*Id*.) Dr. Mango advised plaintiff to treat with heat and non-steroidal anti-inflammatory medicines ("NSAIDs"), as well as physical

therapy three times a week for six weeks. (*Id*. at 213.)

On September 19, 2012, Dr. Mango indicated that plaintiff's condition and partial disability were unchanged, but also that there were new "findings" related to right knee pain. (*Id*. at 211.) The examination revealed persistent left knee pain with prolonged activity, increasing right knee pain due to favoring the left leg, and right knee chondromalacia patella, which was consequential due to plaintiff's antalgic gait. (*Id*.) X-rays of plaintiff's right knee revealed no evidence of fracture or dislocation, with bone quality appearing normal and joint spaces intact. (*Id*. at 212.) Dr. Mango's prognosis was "guarded." (*Id*. at 211.) Dr. Mango recommended that plaintiff use "ice/heat" for treatment, but did not recommend any additional physical therapy. (*Id*.)

On October 17, 2012, Dr. Mango again indicated that plaintiff's condition was "unchanged," that plaintiff had a partial disability, and that plaintiff should use "ice/heat" (and not physical therapy) for treatment. (*Id*. at 210.) On November 14, 2012, Dr. Mango repeated his October 17, 2012 assessment of plaintiff, but noted that plaintiff should also use NSAIDs for treatment. (*Id*. at 209.) On December 17, 2012, January 16, 2013, and February 27, 2013, Dr. Mango's assessment and findings remained unchanged. (*Id*. at 207-08, 295-99.)

On March 20, 2013, Dr. Mango's physical examination of plaintiff's left knee revealed decreased swelling, decreased effusion, decreased medial and lateral facet tenderness, and range-of-motion from 0-125 degrees. (*Id*. at 338.) Dr. Mango opined that plaintiff's disability status was "total" and that he could not return to work due to his left knee pain. (*Id*. at 338-39.)

On April 1, 2013, Dr. Samir Dutta conducted a consultative orthopedic examination of plaintiff. (*Id*. at 197-98, 326-29.) Plaintiff complained of having a knee injury in 2009, which continued to cause him some pain, difficulty standing, walking, lifting, and sitting for a long period of time. (*Id*. at 326.) Plaintiff noted that the pain is usually sharp and shooting in nature, and that the pain is aggravated with any kind of sitting, standing, or walking. (*Id*.) Plaintiff noted that the pain is relieved to some extent with pain medication and intra-articular injection of steroids and Synvisc. (*Id*.) Plaintiff stated that he had lower back pain for one year, which plaintiff described as dull aching. (*Id*.)

Upon examination, plaintiff appeared to be in no acute distress. (*Id*. at 327.) He limped on the left side (both with and without a cane). (*Id*.) Plaintiff had difficulty walking on his heels and toes. (*Id*.) His station was normal, but he could not squat. (*Id*.) Plaintiff stated that the cane was provided by his doctor a year earlier and helped to stabilize his left knee. (*Id*.) Without his cane, plaintiff was able to walk and stand for only a few steps. (*Id*.) Dr. Dutta deemed that the cane was "medically needed," particularly when plaintiff goes "up stairs or walks on uneven surfaces." (*Id*.) Plaintiff did not need any help getting onto or off of the examination table, and was able to rise from his chair without difficulty. (*Id*.)

On examination, plaintiff's range of motion in the shoulders was as follows: forward elevation to 120 degrees bilaterally; abduction to 120 degrees; and full abduction, internal rotation, and external rotation bilaterally. (*Id*. at 327-28.) Plaintiff had 5/5 strength in the proximal and distal muscles, no muscle atrophy, and no sensory or reflex abnormalities in the upper extremities. (*Id*. at 328.) Plaintiff's range of motion in the thoracic and lumbar spine was as follows:

3

flexion to 60 degrees; lateral bending to 20 degrees; extension to 20 degrees; and rotation to 20 degrees. (*Id*.) There was no spinal or paraspinal tenderness and no sacroiliac joint or sciatic notch tenderness. (*Id*.) There was slight spasm in the lower lumbar spine. (*Id*.) A straight leg raising test was negative. (*Id*.) Knee flexion was 120 degrees on the right side and 110 on the left. (*Id*.) An arthroscopic scar, slight tenderness in the front and to the side, and swelling was noted in the left knee. (*Id*.) There was full range of motion of the ankles bilaterally. (*Id*.) In the lower extremities, there was no muscle atrophy; sensory or reflex loss; or effusion, inflammation, or instability. (*Id*.) Plaintiff declined a left ankle X-ray. (*Id*.)

Dr. Dutta diagnosed a post-anterior cruciate ligament repair with cadaver bone graft in the left knee; osteoarthritis degenerative changes; being overweight; and a history of backaches. (*Id*.) Dr. Dutta opined that plaintiff had a mild limitation for sitting, and a moderate limitation on standing, walking, lifting things, ascending and descending stairs, and bending on a continued basis. (*Id*.)

On April 17, 2013, Dr. Mango noted that plaintiff's condition was "unchanged," and that plaintiff's disability was "total." (*Id*. at 341.) On May 15, 2013, Dr. Mango noted that plaintiff's disability status was now "partial." (*Id*. at 342-43.) Dr. Mango recommended physical therapy for plaintiff's left knee, three times a week, for six weeks, along with five Hyalgan injections. (*Id*. at 343.) On June 27, 2013 Dr. Mango's assessment was unchanged. (*Id*. at 345.) In a report the following day, Dr. Mango stated that a series of Hyalgan injections worked very well and provided six months of relief. (*Id*. at 344.) The report made no mention of whether plaintiff could return to work. (*Id*.)

On July 31, 2013, Dr. Mango found that plaintiff's disability status remained partial (*Id*. at 347.) He changed the status to "total" disability on September 9, 2013 because plaintiff was not responding to NSAIDs or cortisone injections. (*Id*. at 348-49.) Disability status remained "total" on October 8, 2013. (*Id*. at 350-51.) Dr. Mango recommended physical therapy three times a week for six weeks, as well as five Hyalgan injections into his left knee. (*Id*. at 350.) On October 15, 2013, Dr. Mango's assessment was unchanged, except he noted that plaintiff's condition had "improved." (*Id*. at 353.)

On October 22, October 29, and November 6, 2013, Dr. Mango reported that plaintiff's condition had "improved," but that he was still totally disabled and needed physical therapy. (*Id*. at 355-58.) On December 11, 2013, Dr. Mango noted "some" improvement, but that plaintiff was still totally disabled. (*Id*. at 361.) On January 15, 2014, Dr. Mango again noted "some" improvement and decreased pain due to the Hyalgan series of injections and physical therapy. (*Id*. at 363.) Dr. Mango found that plaintiff was still totally disabled. (*Id*.)

On January 28, 2014, plaintiff visited Dr. Robert L. Hecht, a physical medicine and rehabilitation physician at Island Musculoskeletal Care, with complaints of pain in both shoulders (greater in the left shoulder) and pain in the mid- and lower back. (*Id*. at 336.) Plaintiff reported to Dr. Hecht that "he injured his left shoulder years ago, secondary to a fall," and that he had had "pain in his back since the end of 2013," but "denie[d] any particular injury." (*Id*.) He also had had a previous work injury to his left knee and underwent arthroscopic surgery for that injury. (*Id*.) Plaintiff also reported to Dr. Hecht that he was in a motor vehicle accident in 2001, resulting in a laceration to his left leg and numbness in the left leg distally to the

4

point of the scar. (*Id.*) Plaintiff reported that he last worked in July 2012. (*Id.*)

Dr. Hecht's examination of the left shoulder revealed diffuse tenderness; abduction to 110 degrees (normal is 180); anterior flexion to 120 degrees (normal is 180); internal rotation to 50 degrees (normal is 90); external rotation to 70 degrees (normal is 90); and positive impingement sign. (*Id.*) Examination of the right shoulder revealed diffuse tenderness; abduction to 130 degrees; anterior flexion to 140 degrees; internal rotation to 70 degrees; external rotation to 70 degrees, and negative impingement sign. (*Id.*) Examination of the thoracolumbar spine revealed tenderness; flexion to 60 degrees (normal is 90); extension to 10 degrees (normal is 30); left lateral flexion to 10 degrees (normal is 30); left lateral rotation to 20 degrees (normal is 30); right lateral flexion to 10 degrees (normal is 20); and right lateral rotation to 10 degrees (normal is 30). (*Id.*) Plaintiff displayed no spasm and normal lordosis, and straight leg raise testing was negative bilaterally. (*Id.*) Plaintiff's left knee had healed arthroscopic portals, tenderness in the medial and lateral joint lines of the knee, mild atrophy of the distal quadriceps, and mild weakness with knee extension. (*Id.*) He lacked extension by 5 degrees (normal is 0), and had flexion to 100 degrees (normal is 135). (*Id.*) He had positive crepitus, McMurray's sign, and Equivocal Lachman's sign. (*Id.*) Plaintiff had a scar in the proximal third of the anterior tibia on the left-hand side, which plaintiff said was from the motor vehicle accident, with decreased sensation to light touch in a patchy distribution extending distally. (*Id.*)

An MRI of the left shoulder conducted on February 5, 2014, revealed: (1) mild supraspinatus tendinosis; (2) low grade partial tear of the distal subscapularis tendon at its insertion; (3) evidence of a Bankart and Hill-Sachs deformity; (4) small gleno-humeral joint effusion with likely synovitis; and (5) moderate achromioclavicular hypertrophy and edema, with trace subacromial/subdeltoid bursitis. (*Id.* at 366-67.)

On February 12, 2014, Dr. Mango noted that there was some decrease in pain while plaintiff was in physical therapy. (*Id.* at 365.) An MRI conducted on March 5, 2014 revealed normal lumbar lordosis and maintained vertebral body heights. (*Id.* at 368-69.) There was minimal retrolisthesis of L5 and S1 and no definite expansile or destructive osseous lesion. (*Id.* at 368.) No abnormal bone marrow edema was identified (*Id.*) Although there was a limited evaluation, the spinal cord signal appeared unremarkable. (*Id.*) There was disc distortion at L1-L2, L4-L5, and L5-S1 and mild disc narrowing at L1-L2 and L5-S1. (*Id.*) There was mild disc bulge at L1-L2, but L1-L2, L2-L3, and L3-L4 had no disc herniation, spinal canal, or foraminal stenosis. (*Id.*) Plaintiff's L4-L5 and L5-S1 displayed mild concentric disc bulge. (*Id.*) The MRI revealed that L4-L5 had mild bilateral facet arthropathy and ligamentum flavum in-folding, which caused mild spinal canal stenosis. (*Id.*) There was mild left foraminal stenosis, but it was not significant on the right. (*Id.*) The paravertebral musculature was grossly unremarkable. (*Id.*) At L5-S1, there was a mild concentric disc bulge with a dorsal annular fissure and associated central disc protrusion (herniation) effacing the ventral thecal sac without significant spinal canal stenosis. (*Id.* at 369.) There was mild bilateral facet arthroplasty with posterior osteophyte spurring causing mild bilateral foraminal stenosis. (*Id.*)

On March 10, 2014, plaintiff visited Dr. Nabil Farakh, an orthopedic surgeon with Island Musculoskeletal Care. (*Id.* at 372-73.) Plaintiff complained of neck and left

5

shoulder pain and also reported to Dr. Farakh a "new condition of exacerbated pain of the cervical spine and right leg pain." (*Id*. at 372.) Plaintiff stated that he had tripped and fell the previous week, causing right leg pain and exacerbating his neck pain. (*Id*.) Plaintiff also complained of pain to the thoracic and lumbar spine, as well as pain to the left shoulder. (*Id*.) Examination of the cervical spine revealed diffuse tenderness, limited range of motion secondary to the pain, paravertebral muscle spasms and tenderness, and a soft compartment. (*Id*.) Plaintiff's muscle strength was full (5/5) in bilateral upper extremities. (*Id*.) Examination of the thoracic and lumbar spine revealed diffuse tenderness, limited range of motion, and soft compartment. (*Id*.) In the lower extremities, muscle strength was full (5/5), and deep tendon reflexes were 2/4 bilaterally. (*Id*.) Plaintiff's left shoulder had a limited range of motion. (*Id*.) Plaintiff had tenderness in the right tibia and fibula area and no tenderness or swelling of the calf. (*Id*.) Plaintiff had full range of motion of right knee and right ankle with pain on anterior aspect of the right leg, and the right lower extremity compartment was soft. (*Id*.) X-rays of the cervical spine revealed decreased normal cervical lordosis and degenerative changes, but no displaced fracture nor dislocation. (*Id*. at 372, 374.) X-rays of the right tibia and fibula revealed no displaced fracture and no dislocation. (*Id*.) Dr. Farakh's impressions were neck pain; chronic thoracic and lumbar spine pain (rule out disc injury); right leg contusion; and impingement syndrome of the left shoulder. (*Id*. at 372.) Dr. Farakh recommended limiting heavy activities involving the spine, left upper extremity, and right lower extremity. (*Id*.)

On March 10, 2014, Dr. Hecht completed a Medical Source Statement of plaintiff's Ability to Do Work-Related Activities (Physical). (*Id*. at 330-35.) Dr. Hecht opined that plaintiff was restricted to occasionally lifting or carrying 5 to 10 pounds. (*Id*. at 330.) He restricted plaintiff to only sitting for 3 hours, standing for 2 hours, and walking for 2 hours in an 8-hour workday. (*Id*. at 331.) Dr. Hecht indicated that plaintiff could sit for 2 hours at a time without interruption and could stand or walk for less than 1 hour without interruption. (*Id*.) Dr. Hecht stated that plaintiff did not need a cane to ambulate. (*Id*.) He opined that with his right hand, plaintiff could occasionally reach and push or pull, and could continuously (more than two-thirds of the time) perform activities involving handling, fingering, and feeling. (*Id*. at 332.) With his left hand, plaintiff could occasionally reach and push or pull, and could frequently (from one-third to two-thirds of the time) participate in handling, fingering, or feeling. (*Id*.) Dr. Hecht opined that plaintiff could occasionally climb stairs, ramps, ladders, and scaffolds; balance; stoop; and crouch. (*Id*.) Dr. Hecht indicated that plaintiff could occasionally tolerate exposure to unprotected heights, moving mechanical parts, and operating motor vehicles; frequently tolerate humidity and wetness, extreme cold, extreme heat, and vibrations; and continuously tolerate dust, odors, fumes, and pulmonary irritants. (*Id*. at 333.) Dr. Hecht noted that plaintiff could perform activities such as shopping and traveling without assistance; was able to ambulate without assistance of a device such as a cane or wheelchair; use standard transportation; climb a few steps at a reasonable pace while using a handrail; prepare a simple meal and feed himself; and care for his personal hygiene. (*Id*. at 334.) Dr. Hecht reported that plaintiff was unable to walk a block at a reasonable pace or on uneven or rough surfaces. (*Id*.) Dr. Hecht stated that the earliest date of the above listed limitations began in July 2012, and he expected the disability to persist. (*Id*. at 335, 337.)

6

Additionally, Dr. Hecht's examination of plaintiff's lower extremities revealed a full active range of motion of both hips, right knee, and both ankles. (*Id.*) Motor strength of the hips, knees, and ankles was full (5/5) bilaterally, and reflexes of the paella and Achilles were 2+ and symmetric bilaterally. (*Id.*) Dr. Hecht assessed derangement of the left knee, status post arthroscopy, lumbar disc bulge, disc desiccations, derangement of the right shoulder, and statuspost laceration to the left leg. (*Id.*) Dr. Hecht reported that the examination findings were consistent with plaintiff's complaints. (*Id.*)

In a physical assessment of plaintiff, dated March 12, 2014, Dr. Mango stated that in an 8-hour work day, plaintiff could walk, stand, sit, push, pull, and bend for 1-2 hours; hear, speak, and use his hands for more than 4 hours; use public transportation for 1-2 hours; and climb or use the stairs for 1-2 hours. (*Id.* at 377-78.) He stated plaintiff could lift/carry up to 10 pounds, and claimed that plaintiff could not participate in employment, education, or training. (*Id.* at 378.) Dr. Mango stated plaintiff could not participate in activities such as rehabilitations or treatment programs, and opined that plaintiff was extremely vulnerable to cold and heat. (*Id.*) He wrote that plaintiff could sit, stand, or walk for only twenty-minute intervals. (*Id.*) Dr. Mango recommended reevaluation in six months, but stated that plaintiff could not currently work due to total disability. (*Id.* at 377-78.)

Upon return to Dr. Farakh on March 14, 2014, plaintiff reported that his lumbar spine pain had improved. (*Id.* at 370.) The improvement lasted for several weeks, but the pain became exacerbated again. (*Id.*) Plaintiff further reported that he still had lumbar and thoracic spine pain, as well as left shoulder pain. (*Id.*) Examination revealed tenderness and limited range of motion in plaintiff's left shoulder. (*Id.*) Examination of the thoracic and lumbar spine revealed diffuse tenderness, limited range of motion secondary to the pain, soft compartment bilaterally in the lower extremities, and full strength (5/5) bilaterally. (*Id.*) Dr. Farakh noted that an MRI of the lumbar spine had shown herniated disc L5-S1, multiple desiccation discs, degenerative changes, and no fracture or dislocation. (*Id.*) Dr. Farakh's impression was that plaintiff had chronic thoracic and lumbar spine pain, herniated disc at L5-S1, and impingement syndrome of the left shoulder with a partial rotator cuff tear. (*Id.*) Dr. Farakh recommended a cortisone and Lidocaine injection in the left shoulder, physical therapy, pain medications as needed, and that plaintiff wear a soft lumbar brace. (*Id.*) Dr. Farakh discussed the possibility of surgery to the left shoulder if symptoms continued and requested a follow up in six weeks. (*Id.*)

3. Plaintiff's Testimony at the Administrative Hearing

On March 20, 2014, plaintiff, accompanied by counsel, testified before the ALJ. (*Id.* at 23-58.) He stated that he lives in a house with his wife, who also is disabled, and that he also has two adult children. (*Id.* at 35.)

In the early 1990s, plaintiff had his own cellular telephone business. (*Id.* at 56.) Plaintiff also worked as a telemarketer for Slomin's Oil Company from September 2011 through January 2012, but resigned because he "couldn't sit or stand too long of a period of time." (*Id.* at 29.) He was looking for work "that wouldn't fixate [him] in that one position." (*Id.* at 30.) Plaintiff then went on to work at Four Seasons as an event coordinator, but "it was straining [his] knee. It was . . . aggravating it again and [his] back." (*Id.* at 31.) That was his last job. (*Id.* at 26.) Plaintiff "set up various point of sale, point of contacts to generate leads for the sales team

throughout Suffolk and Nassau." (*Id*. at 26.) That position did not require him to stay at a desk, but he "still had to stand and . . . lift." (*Id*. at 30.) He worked there from January through July 1, 2012, when he was laid off. (*Id*. at 26-27, 29-30.) Plaintiff's employment at Slomin's and Four Seasons "both were situations where [he] felt [he] was over [his] head with [his] injuries." (*Id*. at 31.) Since then, plaintiff has tried unsuccessfully to find a job in a virtual home office. (*Id*. at 27.)

Plaintiff testified that he has both a cane and a leg brace, but only uses the cane when he has to get out of a car; he uses the leg brace, prescribed by Dr. Mango, constantly. (*Id*. at 55.) He explained that although his home has stairs, "it's hard for [him] to climb up the stairs so [he]'ll keep stuff downstairs rather than go up everyday." (*Id*. at 56.) He cannot kneel, and if he bends, "any bending is going to inflame [his] injuries." (*Id*.) Plaintiff limits the amount of times he has to get in and out of a car, and when he takes Vicodin for pain, he cannot drive and becomes irritable, as well as lethargic. (*Id*. at 56-57.) Plaintiff testified that, rather than take the Vicodin, he prefers to lay down until the pain subsides. (*Id*. at 57.) Although unsure whether his medication would affect his ability to perform in a telemarketing position, plaintiff stated that his position at Four Seasons required a lot of driving and display set-up. (*Id*. at 57.)

Plaintiff estimated that he could only lift "about two to five pounds" without inflaming his injuries. (*Id*. at 31-32.) When his injuries are aggravated, the pain "goes right to the shoulder, back, and then if [he's] standing or sitting it'll go to [his] knees." (*Id*. at 32.) Dr. Farakh prescribed a back belt for plaintiff, and without the belt, he "would be fidgeting a lot standing, sitting." (*Id*. at 32.) In addition, plaintiff testified that he can only walk back and forth to his mailbox without "inflaming his injuries." (*Id*. at 34.) He only may walk up to 5 minutes before needing to rest, and only may stand for up to 10 minutes. (*Id*.) During the ALJ hearing, he asked to stand to avoid muscle spasms. (*Id*.)

Plaintiff testified that he spends his days managing his pain and his doctors' appointments. (*Id*. at 35.) He awakes at 6:00 a.m. and lets the dog out. (*Id*. at 35-36.) He only has energy for the first hour of the day, and does manage to use the bathroom, shower, and dress. (*Id*. at 36.) Plaintiff takes Motrin for inflammation, Flexeril for back spasms, and Vicodin when he "can't level out the pain." (*Id*. at 37.) He tries to avoid Vicodin because "it's a narcotic, it's not a good thing to take so [he tries] and use Motrin to remove the problem." (*Id*. at 38.) Because of his pain, plaintiff must lay down four times a day. (*Id*. at 38.) He has to lay down "at least a good 10 minutes," but sometimes longer, testifying: "It depends, sometimes for no good reason the muscle spasms will last 20 minutes." (*Id*. at 44.) Plaintiff attends physical therapy, when he is covered by insurance, and he has physical therapy sessions at Dr. Farakh's office, although he goes no more than twice a week so as to not "inflame [his] injuries." (*Id*. at 40-41.) However, he explained that his wife had to drive him to the ALJ hearing. (*Id*. at 41.)

Plaintiff testified that, after breakfast, he goes online in search of employment. (*Id*.) He has interviewed with HTN for a work-at-home position as a customer service representative, but had yet to hear back from them at the time of the hearing. (*Id*. at 42.) He has been looking for work since he lost his last job, and searches for work online daily. (*Id*. at 43.) After his daily job search, plaintiff goes about his day, and he goes with his wife and his father to their doctors' appointments, but plaintiff does not do the driving. (*Id*. at 46.) His father lives about two miles away, and his mother takes care of the father. (*Id*.) Plaintiff will sometimes pay his bills online, but his wife or daughter have to do the grocery

shopping. (*Id*. at 47-48.) He can no longer help his wife with the grocery bags. (*Id*. at 48.) Plaintiff's children often come home to help with cleaning the house or yard work, which plaintiff is unable to do. (*Id*. at 48-49.) His wife and daughter clean up after dinner. (*Id*. at 49-50.) At the hearing, the ALJ asked plaintiff: "And you're not, you're, you're just allowing your wife and daughter to do the chores. The cleaning up, you're not able to help at all?" (*Id*. at 51.) Plaintiff explained that he is not able to help and said: "They know, they understand." (*Id*.) Plaintiff also testified that he used to attend church, but he can no longer sit through services. (*Id*. at 53.) Plaintiff has been unable to visit his sister in New Jersey for the past 4-5 years, nor has he taken any vacations. (*Id*. at 53-54.)

When asked whether he would be able to perform a job similar to the one he had at Slomin's were it offered to him, plaintiff replied: "I, I used to, but now I, I know I can't." (*Id*. at 54.) Plaintiff explained that because of the injuries to his back, knee, shoulder, and neck, he no longer can function in a work environment without being medicated, and that he is "choosing not to be medicated." (*Id*.) Although plaintiff had been searching for a job since 2012, he had not received any offers. (*Id*.)

B. Procedural History

On October 12, 2012, Plaintiff filed an application for disability insurance benefits, alleging that he was disabled beginning on July 6, 2012. (*Id*. at 61, 154-60.) On April 9, 2013, the claim was denied (*id*. at 61-69), and plaintiff filed a request for a hearing on April 25, 2013 (*id*. at 87-88). Plaintiff testified at the hearing, which took place on March 20, 2014. (*Id*. at 23-58.) During the hearing, plaintiff attempted to amend the alleged onset date to January 1, 2014, but the ALJ denied the request. (*Id*. at 26.) The ALJ issued an unfavorable decision denying plaintiff's claim on May 16, 2014. (*Id*. at 8-22.) The Appeals Council denied plaintiff's request for review of the ALJ's decision on September 21, 2015, making the ALJ's May 16, 2014 decision the final decision of the Commissioner. (*Id*. at 1-5.)

Plaintiff filed this action seeking reversal of the ALJ's decision on November 18, 2015. (ECF No. 1.) The Court received the administrative record on March 17, 2016. (ECF No. 7.) The Commissioner filed a motion for judgment on the pleadings on June 15, 2016. (ECF No. 9.) Plaintiff filed a cross-motion for judgment on the pleadings on August 16, 2016. (ECF No. 12.) The Commissioner replied on August 30, 2016, and plaintiff replied on September 26, 2016. (ECF Nos. 13, 15.) The Court has fully considered the parties' submissions.

II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Further, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result

9

upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

III. DISCUSSION

A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commi-ssioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlements to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. The ALJ's Decision

Here, the ALJ determined that plaintiff met his burden in proving that he was not presently employed at the time of the hearing and suffered from "severe impairments," namely "degenerative disc disease of the lumbar spine; left shoulder impingement syndrome; and degenerative joint disease of

10

the left knee." (AR at 13.) The ALJ found that these impairments did not, however, fall under the list of impairments outlined in Appendix 1 of the regulations. (*Id.*)

At the fourth step, the ALJ concluded that plaintiff had "the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) . . . ." (*Id.* at 14.) The ALJ based his decision, "in large part, upon a Medical Source Statement of Ability to do Work Related Activities (Physical) by Dr. Robert L. Hecht, the claimant's treating orthopedic surgeon, dated March 10, 2014, and the impression of Dr. Samir Dutta, a physician who examined the claimant for the [Commissioner] on April 1, 2013." (*Id.* at 14 (citations omitted).)

Citing the Medical Source Statement, the ALJ determined that plaintiff "can sit 6 hours during an 8-hour workday, allowing for normal breaks and lunch," and that "based on Dr. Hecht's assessment, [plaintiff] can perform the occasional standing and/or walking (*i.e.*, up to 2 hours) required to perform sedentary work, as described in 20 CFR 404.1567(a)." (*Id.*) The ALJ gave great weight to "that portion of Dr. Hecht's assessment regarding claimant's ability to stand for 2 hours and walk for 2 hours (less than 1 hour at a time without interruption) during an 8-hour workday," but accorded "[l]ittle weight . . . to that portion of the treating doctor's assessment, which limited sitting to 3 hours during an 8-hour workday." (*Id.*) Moreover, the ALJ gave "[l]ittle weight . . . to Dr. Hecht's opinion in his report dated March 10, 2014 . . . [w]here he stated that, the claimant has been unable to work since July of 2012" because that "is an opinion upon an issue reserved to the Commissioner . . . ." (*Id.* at 15.) In addition, the ALJ accorded "[s]ignificant weight . . . to the opinion of Dr. Dutta," although the ALJ did not ascribe "[g]reat weight . . . to Dr. Dutta's opinion of 'moderate' limitation of standing, walking and lifting things as that term is not clearly defined and is therefore too vague to be of probative value." (*Id.* at 14.)

However, the ALJ accorded "[l]ittle weight . . . to the March 20, 2013 through February 12, 2014 opinion[s] of Dr. Enrico S. Mango." (*Id.* at 15.) Although Dr. Mango "found a 100% total disability and an inability to return to work," the ALJ determined that "[t]hese opinions were offered within the context of a Workers' Compensation claim, which focuses only upon [plaintiff's] ability to perform the requirements of his last job," and that "those are opinions [that] are reserved to the Commissioner . . . ." (*Id.*) The ALJ further concluded that Dr. Mango's "opinion that [plaintiff] can sit only 1-2 hours in an 8-hour workday . . . is not supported by the objective findings and is contradicted by substantial evidence in the record." (*Id.*)

With respect to plaintiff's hearing testimony, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not persuasive" because they were "not supported by the medical evidence in the record and [were] inconsistent with his testimony that he left his job as an event coordinator because he was laid off and not because his impairments prevented him from performing the job." (*Id.* at 17.) In addition, the ALJ found that plaintiff "continues to look for both full-time and part-time work every day," and that his "testimony that he can only sit for 5-10 minutes at a time is not credible . . . [g]iven his description of a fairly broad range of daily activities . . . ." (*Id.*)

Having concluded that plaintiff retained the residual functional capacity to perform sedentary work, the ALJ found that plaintiff

11

could not perform his past relevant work as a director of special events for a caterer or as a general/regional manager and showroom manager, but that plaintiff could perform his past work as a telemarketer. (*Id.* at 18.) Consequently, the ALJ determined that plaintiff did not qualify for disability benefits. (*Id.*)

C. Analysis

Plaintiff challenges the ALJ's decision on the following grounds: (1) that the ALJ improperly denied plaintiff's application to amend his alleged onset date; (2) that the ALJ failed to follow the treating physician rule; and (3) that the ALJ's conclusion that plaintiff has the residual functional capacity to perform sedentary work is not supported by substantial evidence.[1] As set forth below, the ALJ failed to provide good reasons for not allowing plaintiff to amend his alleged onset date and for not crediting plaintiff's treating physicians. Thus, remand is warranted, and the Court need not, and does not, reach plaintiff's residual functional capacity argument.

1. Amendment of Alleged Onset Date

Plaintiff argues that the ALJ improperly denied his counsel's request to orally amend his alleged onset date to January 6, 2014 at the hearing. Plaintiff's counsel stated that the "basis of that amendment would be both [plaintiff's] 50th birthday and the medicals that we have concerning the back." (AR at 25-26.) Without explanation, the ALJ seemingly denied the request, stating:

> If it's—if you're alleging his—he's been disabled as of January 1, 2014, does not extend it—it's not for a year or more. Right? So the impairment has to be for at least continuing for a year. Now, I did also have a problem with the [date last injured], but I think that we can go back a little bit further in time.

(*Id.* at 26.) Plaintiff's counsel responded, "Okay, Judge." (*Id.*) In his decision, the ALJ said that plaintiff's "representative again requested that the onset date be amended to January 6, 2014, the claimant's 50th birthday, which the [ALJ] again denied because of durational considerations (*i.e.*, whether the impairment has lasted or can be expected to last 12 months as required by 20 CFR 404. 1509)." (*Id.* at 17.)

The regulation cited by the ALJ states that "[u]nless [an] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. Plaintiff contends that, contrary to the ALJ's determination, he could have satisfied that criterion because Dr. Hecht's March 10, 2014 Medical Source Statement opined that plaintiff's impairments were expected to last for at least 12 subsequent consecutive months. (Pl.'s Br., ECF No. 12-1, at 17.) In addition, he asserts that he was prejudiced by the ALJ's decision because the amended onset date coincided with his fiftieth birthday, and under the relevant regulations, classifying plaintiff as a fifty-year-old "person closely approaching advanced age" would direct a finding of disability by the Commissioner. *See* 20 C.F.R. § 404.1563; 20 C.F.R. § 404 App'x 2, Rule 201.09.

In opposition, the Commissioner contends that (1) plaintiff's counsel consented to the ALJ's decision denying the request to amend the onset date; and (2) in

---

[1] The Court concludes that substantial evidence supports the AL'''s determinations with respect to the other steps of the test for disability claims.

any case, "[p]laintiff was not disadvantaged by the ALJ's decision to consider the entire period starting from the original onset date." (Def.'s Reply Br., ECF No. 13, at 2.) The Court rejects both arguments.

First, it is apparent from the ALJ's decision that plaintiff's counsel did not accede to the original onset date, but in fact "again requested that the onset date be amended to January 6, 2014," which the ALJ "again denied because of durational considerations." (AR at 17.) Further, it is far from clear from the transcript of the administrative hearing that the ALJ actually denied the oral amendment request because he merely stated that "the impairment has to be for at least continuing for a year," and that although he had "a problem with the [date last injured]," the ALJ thought that "we [could] go back a little bit further in time." (*Id.* at 26.) Because it is impossible to discern whether this was an affirmative rejection of the amendment request, plaintiff's counsel's response of "Okay, Judge" (*id.*) cannot be taken as an assent.

Second, contrary to the Commissioner's contention, plaintiff has adequately demonstrated that an amended onset date that coincides with his fiftieth birthday would bolster his claim based on the accompanying classification as a "person closely approaching advanced age." *See, e.g.*, *Stafford v. Astrue*, 581 F. Supp. 2d 456, 460 (W.D.N.Y. 2008) (discussing the benefits of such classification); *Rodriguez v. Comm'r of Soc. Sec.*, No. 15-CV-6596 (ALC), 2016 WL 5660410, at *8 (S.D.N.Y. Sept. 30, 2016) ("The distinction between being classified as a 'younger person' and being classified as a 'person closely approaching advanced age' can be dispositive in determining whether an individual qualifies as disabled.").

Finally, the Court agrees with plaintiff that the ALJ failed to adequately set forth his reasoning for denying the amendment request. In his decision, he simply cited "durational considerations," which, as plaintiff points out, are not supported by the record. Accordingly, remand for further findings is required. *See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (stating that "[w]hen there are gaps in the administrative record" or where "we are unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision," remand is appropriate).

2. Opinion of the Treating Physician

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your

impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). Although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

When an ALJ decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see also Perez v. Astrue*, No. 07-CV-958 (DLJ), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources."

(internal citation omitted)). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Those factors include: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [ALJ's] attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). If an ALJ fails "to provide 'good reasons' for not crediting the opinion of a claimant's treating physician," remand is appropriate. *Snell*, 177 F.3d at 133.

The ALJ here violated the treating physician rule. With regard to Dr. Mango, who had consistently treated plaintiff since July 2010,[2] the ALJ gave "[v]ery little weight" to his opinions of "100% total disability and an inability to return to work" because the "doctor's focus—within the context of a Workers' Compensation claim—was on the claimant's past relevant work as an events coordinator/director of special events for a country club caterer, which was light work requiring a great deal of standing and/or walking; a good deal of climbing and stooping and lifting/carrying 10-20 pounds." (AR at 17.) The ALJ gave "[s]ome weight . . . to that portion of Dr. Mango's assessment of March 12, 2014, which indicated that the claimant, in an 8-hour workday, could stand 1-2 hours and walk 1-2 hours due to severe left knee impairment,"

---

[2] Accordingly, Dr. Mango was the "medical professional[] most able to provide a detailed, longitudinal picture of [plaintiff's] medical impairment(s) and [brought] a unique perspective to the medical evidence . . . ." 20 C.F.R. § 404.1527(c)(2).

but he accorded Dr. Mango's conclusion that plaintiff can sit only 1-2 hours in an 8-hour workday "[l]ittle weight . . . as it is unsupported by objective medical evidence [and] inconsistent with other substantial medical evidence in the record . . . ." (*Id.* at 15, 18.) Finally, the ALJ stated that Dr. Mango's disability determination concerned a matter that was reserved to the Commissioner. (*Id.* at 15.)

In addition, the ALJ selectively accorded some aspects of Dr. Hecht's opinion great weight and others little weight. He gave great weight to "that portion of Dr. Hecht's assessment regarding claimant's ability to stand for 2 hours and walk for 2 hours (less than 1 hour at a time without interruption) during an 8-hour workday," but little weight to "that portion of the treating doctor's assessment, which limited sitting to 3 hours during an 8-hour workday," as well as to "Dr. Hecht's opinion in his report dated March 10, 2014 . . . [w]here he stated that [plaintiff] has been unable to work since July of 2012." (*Id.* at 14-15.) Instead, the ALJ gave "[s]ignificant weight" to the opinion of consulting physician Dr. Dutta, who only saw plaintiff once. (*Id.* at 14.)

The Court concludes that the ALJ failed to provide "good reasons" for rejecting the opinions of the treating physicians. *Snell*, 177 F.3d at 133. The first ground on which the ALJ relied in refusing to credit the opinions of Drs. Mango and Hecht was their determination that plaintiff was completely disabled. However, while "the ultimate finding of whether a claimant is disabled and cannot work . . . [is] 'reserved to the Commissioner,'" that simply "means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability." *Snell*, 177 F.3d at 133 (quoting 42 C.F.R. § 404.1527(e)(1)). Accordingly, rather than merely rejecting that characterization, the ALJ was required to review the entire record to independently determine whether the disability findings by Drs. Mango and Hecht were accurate.

In addition, the Second Circuit has made clear that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. In *Selian*, the ALJ rejected the treating physician's diagnosis based in part on the opinion of another physician who "performed only one consultative examination." *Id.* The Court held that, in doing so, the ALJ failed "to provide 'good reasons' for not crediting [the treating physician's] diagnosis," and that failure "by itself warrant[ed] remand." *Id.*; *see also Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) ("[A] consulting physician's opinions or report should be given limited weight . . . because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day."); *Santiago*, 441 F. Supp. 2d at 628 (holding that ALJ erred in giving consulting physicians' opinions controlling weight over those of the treating physicians). By crediting the opinions of the consulting physician over those of the treating physicians, the ALJ here committed the same error as the ALJ in *Selian*, given the absence of other substantial evidence to corroborate those opinions. 708 F.3d at 419; *see also Cruz*, 912 F.2d at 13; *Santiago*, 441 F. Supp. 2d at 628.

Moreover, both Dr. Hecht's and Dr. Mango's opinions are consistent with the medical record. Dr. Hecht opined that plaintiff could only sit for up to 2 hours at a time, for a total of 3 hours in an 8-hour workday. (AR at 331.) Similarly, Dr. Mango stated that plaintiff was "very limited" in his ability to sit, amounting to 1-2 hours in an 8-hour workday. (*Id.* at 378.) Additionally, Dr. Hecht determined that plaintiff had

15

significant limitations to his thoracolumbar range of motion with flexion to 60 degrees (normal is 90); extension to 10 degrees (normal is 30); left lateral flexion to 10 degrees (normal is 30); left lateral rotation to 20 degrees (normal is 30); right lateral flexion to 10 degrees (normal is 20); and right lateral rotation to 10 degrees (normal is 30). (*Id.* at 337.) Likewise, Dr. Mango noted lumbar pain with spasms and decreased lumbar range of motion (*id.* at 248-52, 256), and Dr. Farakh, plaintiff's treating orthopedic surgeon, diagnosed chronic lumbar pain and limited range of motion (*id.* at 370, 372). The treating doctors' findings are also consistent with the lumbar MRI, which showed a central disc herniation at L5-S1 effacing the ventral thecal sac. (*Id.* at 369.) Notwithstanding this corroboration, the ALJ improperly chose to credit those portions of the treating physicians' opinions that supported his determination and to discount those that did not, without sufficient explanation. *See, e.g.*, *Molina v. Colvin*, No. 13-CV-4989 AJP, 2014 WL 3445335, at *17 (S.D.N.Y. July 15, 2014) ("This inconsistent use of Dr. Mescon's opinion, without any explanation by ALJ Borda, is insufficient to support his physical residual functional capacity assessment that [the plaintiff] could perform light work."); *Beck v. Colvin*, No. 13-CV-6014, 2014 WL 1837611, at *13 (W.D.N.Y. May 8, 2014) ("The ALJ improperly cherry-picked from [that doctor's] opinions only the information that purportedly favors a finding of no disability."); *Tim v. Colvin*, No. 12-CV-1761, 2014 WL 838080, at *7 (N.D.N.Y. Mar. 4, 2014) ("[A]n administrative law judge may not 'cherry-pick' medical opinions that support his or her opinion while ignoring opinions that do not.").[3]

Finally, the ALJ's invocation of plaintiff's "Workers' Compensation claim" as a basis for according little weight to Dr. Mango's claim was not sufficient to support his decision. (AR at 15.) Although the Court agrees that "an opinion rendered for purposes of workers' compensation is not binding on the" Commissioner, *see, e.g.*, *Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994) (citing *Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984), that does not countenance the ALJ's sweeping decision to afford little weight to all of Dr. Mango's opinions from March 20, 2013 to February 12, 2014. As with the disability determination, even though those findings regarding a Workers' Compensation claim were not dispositive, the ALJ was still required to consider the various factors discussed above in determining how much weight to give each of Dr. Mango's assessments, and give specific reasons for affording little weight to those assessments. *See Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). He did not do so in his decision.

In short, the ALJ failed to provide "good reasons" for rejecting the treating physicians' opinions. *Snell*, 177 F.3d at 133. That failure "by itself warrants remand." *Selian*, 708 F.3d at 419.[4]

---

[3] In particular, the ALJ's citation of a "report dated June 27, 2013" in which "Dr. Mango stated that a series of Hyalgan injections worked very well and provided 6 months of relief and his assessment of the degree of the claimant's disability was lowered to 50%" as an example of "inconsistent evidence" (AR at 15-16) is another example of "cherry-picking" because that report pre-dated the hearing by approximately nine months and was followed by Dr. Hecht's March 10, 2014 Medical Source Statement assessing that he expected plaintiff's disability to persist (*id.* at 335, 337), as well as Dr. Mango's March 12, 2014 report stating that plaintiff could not work due to total disability (*id.* at 377-78).

[4] Accordingly, the Court need not, and does not, address plaintiff's argument that the ALJ's decision was not supported by substantial evidence.

## IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.[5]

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 9, 2017
      Central Islip, NY

\* \* \*

Plaintiff is represented by John W. DeHaan of The DeHaan Law Firm P.C., 300 Rabro Drive East, Suite 101, Hauppauge, New York 11788. The Commissioner is represented by Joseph A. Marutollo, Assistant United States Attorney, on behalf of Robert L. Capers, United States Attorney for the Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York, 11201.

---

[5] Although plaintiff has requested that the Court order this action to be re-assigned to another ALJ upon remand (*see* Pl.'s Br. at 25), the Court finds that plaintiff has failed to show that the ALJ's conduct in this action "gives rise to serious concerns about the fundamental fairness of the disability review process . . . ." *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004). Accordingly, the Court leaves re-assignment to the Commissioner's discretion.